**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PAMELA S. KOKOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 12 C 5271** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Pamela S. Kokos seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416(i), 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants the Commissioner's motion, denies Plaintiff's motion, and affirms the decision to deny disability benefits.

**PROCEDURAL HISTORY**

Plaintiff applied for DIB on October 20, 2009, alleging that she became disabled on January 17, 2009[2] due to: fibromyalgia; arthritis in the knees, neck

---

[1] Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

and shoulders; bursitis in the hip; tendinitis in the elbow; and "back surgery and pain." (R. 177, 201). The Social Security Administration denied the applications initially on December 29, 2009, and again upon reconsideration on April 21, 2010. (R. 103-15). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Roxanne J. Kelsey (the "ALJ") on February 4, 2011. (R. 63). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Pamela J. Tucker (the "VE"). Shortly thereafter, on April 15, 2011, the ALJ found that Plaintiff is not disabled because there are a significant number of light jobs she can perform in the national economy. (R. 20-31, 40-51). The Appeals Council denied Plaintiff's request for review on May 4, 2012, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

Plaintiff raises multiple arguments in support of her request for remand, including that the ALJ: (1) failed to properly consider the combined effects of Plaintiff's obesity together with her other impairments; (2) erred in weighing the physician opinion evidence; (3) made a flawed RFC determination; and (4) erred in assessing Plaintiff's credibility. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and does not require reversal or remand.

---

[2]     Plaintiff initially alleged on onset date of January 7, 2009 but amended it to January 17, 2009 at the administrative hearing. (R. 20).

## FACTUAL BACKGROUND

Plaintiff was born on July 15, 1958, and was 52 years old at the time of the ALJ's decision. (R. 65, 177). She has a high school diploma and worked at various times as a bartender, hostess/office worker and waitress. (R. 65-66, 202). Though Plaintiff says she did not become disabled until January 2009, it appears that she stopped working as of January 2007. (R. 218).

### A.    Medical History

Plaintiff had back surgery in 1985 and again in late 2005. (R. 459, 572). Throughout 2006, she routinely sought treatment with Patrick S. Cosgrove, D.O., at the Hammond Clinic for various conditions including a bleeding ulcer. In December 2006, she first started complaining of constant joint pain and stiffness. (R. 784). At appointments with Dr. Cosgrove in June and October 2007, Plaintiff said that she had been experiencing severe pain all over her body for the past year, including constant numbness in the shoulders, hands, hips and feet. (R. 773, 776). Dr. Cosgrove prescribed Lyrica and by November 1, 2007, Plaintiff was feeling 75% better. (R. 772).

#### 1.    2008

Plaintiff reported "feeling ok" when she saw Dr. Cosgrove on January 25, 2008, and he increased her dosage of Lyrica. (R. 770). The Lyrica was still helping on February 28, 2008, but Plaintiff complained of continued diffuse joint pain in the shoulders, wrists and hips. (R. 769). Dr. Cosgrove referred her to Anita M. Zachariah, M.D., at the Hammond Clinic for evaluation of muscle pain. At that initial visit on March 3, 2008, Plaintiff told Dr. Zachariah that she had been

experiencing diffuse pain in both hips and shoulders for 1 1/2 years, and suffers from osteoarthritis ("OA") in her knees. She complained that her arms were falling asleep, her hands felt stiff in the morning, and she had an aching pain in her hips and legs. Plaintiff said that she cannot take non-steroidal anti-inflammatory drugs ("NSAIDs") due to a history of gastric ulcers but was getting mild pain improvement from the Lyrica. (R. 763). On examination, Dr. Zachariah noted tenderness in Plaintiff's hands and hips with full range of motion and normal strength in both legs. (R. 764). She diagnosed trochanteric (hip) bursitis, prescribed Lidoderm patches and Tramadol for the pain, and referred Plaintiff to physical therapy ("PT"). (R. 765).

At Plaintiff's Initial Evaluation for PT on March 13, 2008, she noted her history of shoulder and wrist pain but said she wanted to prioritize her hip pain at that time. (R. 365). The next day, on March 14, 2008, Plaintiff had an X-ray of the cervical spine to evaluate the numbness in her hands. The test showed intervertebral disc space narrowing and neural foramina stenosis at C2-C3, intervertebral disc space narrowing at C5-C6, and mild narrowing at C4-C5. (R. 343). Plaintiff had PT on March 21 and 28, 2008, and reported "doing good" with a pain level of 2/10. (R. 363, 364).

When Plaintiff returned to Dr. Zachariah on April 2, 2008, she said that the PT, Lyrica and Lidoderm patches had been helpful for her hip bursitis, but she still had pain in her right arm radiating down to the hand, and she complained of joint pain and stiffness. (R. 361). Dr. Zachariah opined that the cervical X-rays showed "significant" OA in the neck, (*id.*), and diagnosed shoulder bursitis. (R.

362). She referred Plaintiff for more PT and gave her cortisone injections to help with the shoulder pain. (*Id.*). Plaintiff attended PT sessions on April 4 and 9, 2008, and reported that she was "doing good" and her symptoms were better. (R. 358, 359).

On May 12, 2008, Plaintiff had bilateral wrist and hand X-rays. The results were normal with no evidence of fracture, dislocation, osseous destruction, erosions, or abnormal calcifications. (R. 339). X-rays of both knees taken the same day showed "bilateral narrowing in the medial joint compartments right greater than left, mild severity." (R. 340-41). At a follow-up visit with Dr. Zachariah on May 15, 2008, Plaintiff reported that her shoulder and right hip were bothering her again, and she complained of joint pain and swelling. (R. 766). Dr. Zachariah diagnosed hip bursitis that was not improving, and OA of the lower leg, including the fibula, knee, patella and tibia. She gave Plaintiff cortisone injections in the hip and knee to assist with the pain. (R. 767).

Plaintiff next saw Dr. Zachariah on June 19, 2008 for an established follow-up appointment. She was still struggling with the hip bursitis and OA of the knees, and indicated that the injections had only helped for 2 or 3 weeks. (R. 760). Dr. Zachariah gave Plaintiff a Synvisc injection in her right knee and said she would consider giving Plaintiff another hip injection when she returned the following week. (R. 761). At that June 26, 2008 visit, Plaintiff's hip bursitis was better and Dr. Zachariah decided against another injection. She also noted that Plaintiff was reporting only minimal hand symptoms. (R. 758). As for the knee

pain, Plaintiff confirmed that the Synvisc had helped so Dr. Zachariah gave her a second injection as scheduled. (R. 759).

Plaintiff reported continuing improvement when she saw Dr. Zachariah again on July 3, 2008. The pain in her hip, shoulder and hand was better and she had no joint swelling or stiffness. (R. 756). Dr. Zachariah gave Plaintiff a third Synvisc injection in the knee and said she could return only as needed. (R. 757). More than two months later, on September 29, 2008, Plaintiff saw Dr. Zachariah for a follow-up evaluation of her knee pain. She did not have any joint swelling or stiffness, but she requested additional injections to help with increased symptoms in the right knee and hip. (R. 749). Dr. Zachariah described Plaintiff's OA in the lower leg as "improving," gave her cortisone shots in the knee and hip, and instructed her to continue using the Lidoderm patch and Lyrica. (R. 750).

**2.    2009**

A few months later, on January 14, 2009, Plaintiff was admitted to the Munster Community Hospital after her husband found her unconscious from alcohol intoxication. (R. 659-60). She was prescribed Librium to help with the withdrawal symptoms and discharged three days later on January 17, 2009. (R. 662-64). Plaintiff claims that she became disabled the day of her discharge.

When Plaintiff saw Dr. Cosgrove on May 19, 2009, she was "feeling well" with no edema or varicosities of the extremities, and was regularly attending Alcoholics Anonymous ("AA") meetings. Dr. Cosgrove diagnosed her with stable diabetes mellitus and noted that she weighed 231 pounds at a height of 5'8". (R.

6

733, 831, 967-68).   Plaintiff next saw Dr. Cosgrove for a routine visit and medication refill on August 12, 2009.  She was "[f]eeling great" at that time, once again presenting with no edema or varicosities of the extremities.  (R. 727, 972).  Dr. Cosgrove diagnosed benign hypertension ("HTN") and scheduled a follow-up visit for November 2009 to obtain updated lab tests.  (R. 728, 972).

On October 27, 2009, Plaintiff had an appointment with Dr. Zachariah to assess her knee pain.   Dr. Zachariah noted Plaintiff's history of OA, HTN, bursitis, fibromyalgia, obesity, and gastrointestinal ("GI") ulcers from NSAID use.  Plaintiff had no joint swelling or stiffness but she did present with joint pain that was disturbing her sleep, and she requested additional injections.  (R. 839).  Dr. Zachariah observed that Plaintiff's gait was intact and her knee was "normal to inspection and palpation."   Since Plaintiff reported that the Lidoderm patches were "really not helping," however, Dr. Zachariah gave her a Synvisc injection for the knee pain and a cortisone shot in the hip for the bursitis pain.  (R. 840).

Plaintiff returned to Dr. Zachariah on November 3, 2009 for a follow-up evaluation.  She continued to complain of joint pain but there was no swelling or stiffness and her sleep had improved.  Plaintiff's hip bursitis and knee pain were also better following the injections, though she did experience one day of knee pain over the previous week.  (R. 836).  On examination, Plaintiff's gait remained intact and her knee was normal.  Dr. Zachariah gave her another Synvisc injection and instructed her to return in one week.  (R. 837).  At that November 11, 2009 visit, Dr. Zachariah noted that Plaintiff's BMI was 36.49 and confirmed her history of: diffuse OA of knees, helped by Synvisc; right hip bursitis "which is

7

better after injection"; obesity; fibromyalgia; and GI ulcer. Plaintiff said that she was "[s]tarting to exercise again," had no joint swelling, stiffness or pain, and was still sleeping well. (R. 831). Dr. Zachariah gave Plaintiff another Synvisc injection in the right knee, (R. 832, 1065), and instructed her to return in six months. (R. 833).

The following day, on November 12, 2009, Plaintiff saw Dr. Cosgrove for a check of her blood pressure and lab results. (R. 965). Plaintiff was "motivated to start diet and exercise" at that time and Dr. Cosgrove diagnosed her with stable diabetes. (R. 829, 966). Plaintiff's next two visits with Dr. Cosgrove in November and December 2009 related solely to her complaints of tonsillitis and a subsequent tonsillectomy. (R. 1050-51, 1053-55).

On December 21, 2009, Charles Wabner, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 903-10). Dr. Wabner found that Plaintiff can occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk and sit for about 6 hours in an 8-hour workday; and push/pull without limitation. (R. 904). Plaintiff can occasionally climb, balance, stoop, kneel, crouch, and crawl and has no other limitations. (R. 905-07).

### 3. 2010

On January 28, 2010, Plaintiff saw Elisa Rhodes, NP, at the Hammond Clinic with complaints of right foot pain. Plaintiff admitted to injuring her foot two years prior while walking up stairs and never having it examined. Now, she was experiencing shooting pain to the bottom of her foot and up the ankle, with

8

throbbing at times. She rated the pain as a 7/10 with standing, and described trying to walk on the side of her foot to compensate for the pain. (R. 924). Nurse Rhodes reported that Plaintiff had a normal gait, station and posture, and the sensation in her foot was intact. There was trace edema (swelling) in the right ankle, however, and decreased range of motion in both the ankle and foot, especially with flexion. Nurse Rhodes gave Plaintiff a "cam" (controlled ankle motion) walker to help her avoid further injury, prescribed Ultram and Darvocet, and scheduled her for a follow-up visit in one week. (R. 925). The same day, Plaintiff went for X-rays of her right foot and ankle. The tests showed spurring at the superficial aspect of the medial malleolus compatible with old trauma, as well as mild degenerative findings of the first metatarsal phalangeal joint, but was otherwise unremarkable. (R. 922, 993).

Plaintiff returned to Nurse Rhodes on February 3, 2010, for a recheck of her right foot. She said that she had used only one Darvocet since her last visit and was not wearing the cam boot often, i.e., only a "couple times in past week." Plaintiff also denied having severe pain at that time. (R. 920, 956). Nurse Rhodes noted that Plaintiff had a normal gait, station and posture, and told her to wear the cam walker as directed and follow-up with a podiatrist. (R. 920-21, 956). It does not appear from the record that Plaintiff in fact consulted with a podiatrist.

When Plaintiff saw Dr. Cosgrove on February 12, 2010 to check her blood pressure, she complained of continued right foot pain that felt like "pins and needles." (R. 917, 959). Dr. Cosgrove diagnosed diabetes with possible

neuropathy and benign HTN, indicated that Plaintiff would likely need an EMG and a consultation with a neurologist, and asked her to return in three months. (R. 918, 959). On February 23, 2010, Plaintiff went for a follow-up visit with Dr. Zachariah. The doctor noted that Plaintiff's BMI was 36.79, the diffuse OA of her knees was "now better" with Synvisc, her hip bursitis was also "better after injection," and she had no joint swelling, pain or stiffness. (R. 915, 1058). Plaintiff reported that after shoveling snow, however, she was now having pain in her neck and cervical muscles, as well as numbness in the right foot. (*Id.*). On examination, Plaintiff had normal range of motion in her spine but paramusculature tightness and tenderness on the right side. To help with Plaintiff's "muscle spasm after activity," Dr. Zachariah prescribed Flexeril and Limbrel. (R. 916).

Plaintiff returned to Dr. Zachariah for a routine follow-up on March 16, 2010. The treatment note was largely unchanged from the previous visit, except that Plaintiff reported improvement in her neck and cervical pain with the Limbrel and Flexeril. (R. 912, 1062). Dr. Zachariah instructed Plaintiff to return as needed. (R. 913). The following month, on April 14, 2010, Plaintiff had a nerve conduction EMG study performed on her legs. The findings were "most consistent with mild right chronic L5-S1 radiculopathy." (R. 1178).

Five days later, on April 19, 2010, Vidya Madala, M.D., affirmed Dr. Wabner's December 29, 2009 RFC assessment. Dr. Madala considered new treatment records showing that Synvisc had helped with Plaintiff's knee pain symptoms, and that her bursitis had likewise improved following injections. He

10

also cited to Dr. Zachariah's March 16, 2010 treatment note indicating that Plaintiff exhibited no joint swelling, stiffness or pain, as well as documentation of normal range of motion in the spine on February 23, 2010. Though Plaintiff alleged that her conditions had worsened, Dr. Madala found no evidence of this in the record and thus affirmed that Plaintiff is capable of performing light work. (R. 938).

The next day, on April 20, 2010, Plaintiff had an MRI of the lumbar spine. The test showed: persistent central disc herniation at T11-12 resulting in "moderate compression of the ventral thecal sac with mild central canal stenosis suspected"; diffuse disc bulging at L3-4 with degenerative facet change resulting in mild central spinal canal narrowing; postoperative changes at L4-5 and L5-S1 with disc bulging and degenerative facet changes; and "[r]esidual narrowing of the inferior proximal right neural foramen at L5-S1." (R. 941).

When Plaintiff saw Dr. Cosgrove on May 14, 2010 for a check of her cholesterol, her BMI was 38.16. (R. 974). Dr. Cosgrove started her on simvastatin to help lower her cholesterol, recommended that she focus on diet and exercise, and instructed her to return in three months. (R. 975). Five days later, on May 19, 2010, Plaintiff called Dr. Cosgrove and Dr. Zachariah because her application for disability benefits had been denied and her lawyers told her "she needs to make sure her physicians will support her in this action." Plaintiff said that she was seeking disability "with diagnosis of fibromyalgia and history of back surgery in 2005," and noted that she was a waitress and could "no longer lift, or even do yard work on her knees anymore." (R. 976). Dr. Zachariah

responded by email that she "can't support this as a reason for disability." Dr. Cosgrove responded by email that "I would say she could still work, maybe not her current job, or with restrictions. I would say she is not completely disabled." (*Id.*).

Plaintiff subsequently started treating with Vijay Gupta, M.D., of the Hammond Pain Clinic for lower back pain radiating to the right leg. At an initial June 29, 2010 visit, Plaintiff reported having more pain with walking and standing for long periods of time, and complained of numbness and tingling in her foot. (R. 1160). Straight leg raise tests were negative but a Patrick's sign, a test used to determine the presence of arthritis, was positive on the right side. Dr. Gupta diagnosed status post laminectomy at L4-5 and L5-S1, bulging disc at L5-S1 causing central canal stenosis, and right foraminal stenosis. (R. 1161). He recommended that Plaintiff have a transforaminal epidural steroid injection to help with the pain, (R. 1162), and Plaintiff underwent that procedure on July 2, 2010. (R. 1156-57).

Between August 18 and October 18, 2010, Plaintiff attended 19 physical therapy sessions at St. Margaret Mercy Rehabilitation Services. (R. 945-46). At her last visit, the therapist noted that she had achieved four of six goals but not the ones relating to standing and walking. (R. 983). The initial assessment identified those two goals as: being able to stand for 10-15 minutes without increased complaints of pain; and being able to walk short distances for exercise. (R. 1171). The therapist indicated that Plaintiff needed to continue exercising, (R. 983), and gave her an Exercise Referral to the Omni Health & Fitness

Connection, an affiliate of St. Margaret Mercy. (R. 1176). The referral stated that Plaintiff should not jog, stair climb, cross country ski, take high impact dance exercise classes, or bend too much, but she otherwise had no restrictions in her ability to engage in activities. (*Id.*).

In the meantime, Plaintiff returned to Dr. Cosgrove on August 25, 2010 to review lab test results. (R. 979). Dr. Cosgrove noted that Plaintiff's BMI was 38.31, and diagnosed her with stable diabetes, stable cholesterol disorder and benign HTN. (R. 979-80). He instructed her to return in six months. (R. 981). At a follow-up appointment with Dr. Gupta on September 7, 2010, Plaintiff indicated that the epidural steroid injection had "helped her enormously," as had the PT, though the walking in water made her feet "very sore." In addition, some of the pain had returned at a level of 5-6/10, which rendered her unable to do her day-to-day chores. (R. 1151). Dr. Gupta noted that straight leg raise tests and Patrick's signs were negative on both sides, and he diagnosed bulging disc at L5-S1, central canal stenosis and right foraminal stenosis. (R. 1152). He recommended a second transforaminal epidural steroid injection at L5, (*id.*)., which Plaintiff had on September 10, 2010. (R. 1149).

The following month, on October 28, 2010, Plaintiff started treating with Sadiq Altamimi, M.D., at the Hammond Clinic for her lower back pain. (R. 1000-04). Plaintiff said that the epidural steroid injection she had received in July 2010 had not helped, but that a second injection in September did. She complained of sharp pain radiating to the right leg, weakness of the lower extremities, muscle cramps in her calf muscles, and neck pain. She reported sleeping in a recliner

for the previous 5 years, gaining 80 pounds, and responding well to Lyrica, Ultram and Flexeril. (R. 1000). Dr. Altamimi noted that Plaintiff's BMI was 39.38, (R. 1002), and observed that her gait, stability, reflexes and sensation were all abnormal. (R. 1003). He diagnosed lower back pain, foot pain and ataxia (lack of muscle coordination), and instructed her to add Lidoderm patches to her medication regimen. (*Id.*).

### 4.    2011

Plaintiff next saw Dr. Altamimi on January 10, 2011, at which time he diagnosed her with lower back pain, cervical spondylosis and peripheral neuropathy. A straight leg raise test was positive on the right at 45 degrees, but her stability and muscle strength were normal. Dr. Altamimi recommended that Plaintiff continue with her same medications but decrease the dosage of Lyrica. He also referred her for an MRI and EMG. (R. 1187-88). The January 19, 2011 MRI of Plaintiff's cervical spine showed degenerative changes at C5-8 with a small right paracentral disc protrusion, but no significant central spinal or foraminal stenosis. (R. 1183). An EMG of both arms taken the same day was described as abnormal, with evidence of a "mild sensorimotor polyneuropathy involving the bilateral upper and right lower extremity," but no evidence of radiculopathy. (R. 1196).

On February 3, 2011, Dr. Altamimi completed a Physical Residual Functional Capacity Questionnaire for Plaintiff based on treatment he said he

provided on four occasions in four months.[3] (R. 1190-94). He stated that Plaintiff has constant sharp back pain radiating to the right foot that worsens with standing. The clinical findings he cited included the positive straight leg raise test on the right at 45 degrees and decreased vibration "more on right foot." (R. 1190). Dr. Altamimi opined that Plaintiff is capable of a low stress job that allows her to: shift positions at will from sitting, standing or walking; take unscheduled breaks every hour throughout the day; and elevate her legs 12 inches for 60% of the workday. (R. 1191-92).

With respect to Plaintiff's exertional and postural limitations, Dr. Altamimi stated that she can: occasionally lift 10 pounds; frequently lift less than 10 pounds; walk one city block without rest or severe pain; sit for one hour at a time; stand for 5 minutes at a time; sit for less than 2 hours in an 8-hour workday; occasionally look down, look up and turn her head; frequently hold her head in a static position; rarely twist or crouch/squat; occasionally stoop and climb stairs; and never climb ladders. (R. 1191-93). Dr. Altamimi checked "Yes" in response to the question whether Plaintiff has significant limitations with reaching, handling and fingering, and opined that she can grasp with her hands 50% of the workday, and perform fine manipulation and reach for 30% of the workday. (R. 1193). According to Dr. Altamimi, Plaintiff is likely to have good days and bad days, and to be absent from work more than four days per month. (*Id.*).

---

[3]    The record contains only the two treatment notes from Dr. Altamimi dated October 2010 and January 2011. (R. 1000-04, 1187-88).

**B.     Plaintiff's Testimony**

On November 19, 2009, Plaintiff completed a Function Report in connection with her application for disability benefits.  (R. 209-16).  She stated that she sleeps in a recliner and needs to be up for two hours before she feels physically ready to shower.  Each day she feeds and lets the dogs out and tries to do one cleaning chore depending on how she feels.  (R. 209).  This includes dusting, laundry, limited cleaning, very limited yard work, and limited vacuuming as long as she does not lift any heavy objects or kneel.  (R. 209, 211-12).  Plaintiff is able to drive herself places, and stated that once a day she visits either her grandmother, her parents or her in-laws.  (R. 209, 212).  She also attends nightly AA meetings, (R. 209), prepares frozen dinners or sandwiches, (R. 211), shops for clothes and food for short periods of time "if having a good day," (R. 212), and enjoys scrapbooking and watching television.  (R. 213).  With respect to physical abilities, Plaintiff stated that lifting 20 pounds is "pushing it" and squatting is "almost impossible."  Bending is very painful, she can only stand in one spot for 5 minutes, and reaching is painful when her arthritis is "acting up."  She estimates that she can walk about 5 to 10 minutes before needing to rest for another 5 to 10 minutes.  (R. 214).

Plaintiff completed a second Function Report on April 8, 2010 that was essentially identical to the previous report.  (R. 241-48).  She indicated that sometimes her kids come over and help with the vacuuming and cleaning, and if she tries to "take advantage of" a good day by doing more chores, she "will pay for it" later.  (R. 243).  Plaintiff stated that her husband now does the grocery

shopping and she only shops in places where she can sit. (R. 244). Since she is unable to kneel and lift, her gardening consists of putting flowers into pots that her husband has filled with dirt. (R. 245). Otherwise, Plaintiff remains very active in AA and close to her family. (*Id.*). She mentioned the cam walker prescribed in December 2009 but says she does not use it "because of my back." (R. 247).

In a Physical Impairments Questionnaire completed the same day, Plaintiff stated that she can push a cart at the grocery store, but her husband has to take out the trash and do any other heavy lifting. (R. 250). She can only sit for about 15 minutes before needing to get up and move around, and she sometimes has trouble getting out of the recliner where she sleeps. On a normal day, Plaintiff needs to rest for 70% of the day; if her fibromyalgia is bad, however, she needs to rest for 80% of the day. (R. 251).

At the February 4, 2011 hearing before the ALJ, Plaintiff testified that she is most bothered by her lower back and right leg, but also suffers from OA in the knees, hip bursitis, fibromyalgia and slight peripheral neuropathy. (R. 66-67). She had epidural steroid injections in October 2010 that "[d]efinitely helped [her] foot," but they did not help her back and she continues to have shooting pain and numbness in the right leg. (R. 66-67). Plaintiff said that as long as her foot is not bothering her, she is able to drive at least 30 minutes to attend appointments, go to the store, and visit family, though she does have some back and hip pain getting in and out of the car. (R. 69). With respect to other physical activities, Plaintiff testified that she: cannot lift more than 10 pounds; can only walk a block

17

without stopping; can sit for an hour before needing to get up and move around; can stand for 5 minutes at a time; and can use her hands without trouble "for awhile," but they "start to go numb." (R. 81-84).

Plaintiff said that on a typical day, she often visits her grandmother, does some light chores, including laundry, and makes light meals such as frozen dinners or soup. (R. 75-76). She goes to the grocery store once every two weeks and is very active in AA, attending meetings between 7 and 10 times a week. (R. 76-77). Plaintiff confirmed that she is able to plant flowers in pots if someone else adds the soil, and that she does "a lot of" scrapbooking with her sister, though she only works for about half an hour and completes one page at a time due to her problems looking down and pain and numbness in her wrists and hands. (R. 78-79, 85). Other hobbies include reading and watching television. (R. 80). Plaintiff stated that her pain is typically at a 7/10, (R. 81), and she has bad days 7 times a month when she does not want to even get out of bed. (R. 84). The medications help "somewhat" in that regard, as do hot showers and PT. (R. 70). Nevertheless, the back pain is "always there," radiating down her right leg, and the neck pain emerges if she looks down or turns her head too much. (R. 81).

## C.    Vocational Expert's Testimony

Pamela Tucker testified at the hearing as a VE. The ALJ asked her to consider a hypothetical person of Plaintiff's age, education and past work experience who can perform light work with only occasional climbing, balancing, stooping, crouching, crawling and kneeling. The VE testified that such a person

would be able to perform Plaintiff's past work as a waitress, bartender and office helper, which she characterized as light and semi-skilled. (R. 90-91). The same jobs would be available if the person could not stand in one spot for more than 10 minutes without being allowed to sit or walk a short distance. In addition, the person could work as a dining room attendant (3,100 jobs available), laundry worker (2,400 jobs available), and parking lot attendant (1,900 jobs available). (R. 92). None of these jobs would be available, however, if the person would miss two or more days of work per month, would be off task 15% or more of the workday, or could only use her hands to grasp for half an hour before needing to stop using them for an hour. (R. 93-94). If the same hypothetical person were limited to sedentary work, then she would not be able to perform her past work and would "grid out" due to an absence of transferrable skills. (R. 93).

## D.   Administrative Law Judge's Decision

The ALJ found that Plaintiff's "low back impairment with continued difficulties following two surgeries," OA in both knees, right hip bursitis, degenerative disc disease of the cervical spine, obesity, and right ankle impairment are all severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 42-46). After reviewing the medical records in detail, the ALJ determined that Plaintiff has the capacity to perform light work involving occasional lifting of 20 pounds; frequent lifting of 10 pounds; standing, walking and/or sitting for 6 hours in an 8-hour workday; no prolonged standing in one spot longer than 10 minutes without

being permitted to sit or walk a short distance; and occasional climbing, balancing, stooping, crouching, crawling and kneeling. (R. 46).

In reaching this conclusion, the ALJ gave very little weight to the opinion of Dr. Altamimi, explaining that it was based on only four examinations over a four-month period, was "quite conclusory, providing little explanation of the evidence relied on in forming that opinion," and was inconsistent with laboratory findings and Plaintiff's course of treatment. (R. 49). At the same time, the ALJ gave significant weight to Dr. Wabner's opinion that Plaintiff is capable of light work, (R. 45), as well as controlling weight to the opinions of long-term treaters Dr. Cosgrove and Dr. Zachariah, which she found to be supported by the "objective medical evidence and the overall record." (R. 49). The ALJ acknowledged Plaintiff's testimony that she is completely unable to work, but noted that medication has been relatively effective in controlling her symptoms. (R. 48). In addition, despite claims of disabling hand pain and numbness, Plaintiff engages in activities requiring "frequent use of her hands and wrists" such as scrapbooking and gardening. (*Id.*).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing her past work as a bartender, waitress, and office helper, as well as a significant number of other light jobs available in the regional economy, including laundry worker, dining room attendant, and parking lot attendant. (R. 50). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

**DISCUSSION**

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by §
405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g).    In reviewing this
decision, the Court may not engage in its own analysis of whether Plaintiff is
severely impaired as defined by the Social Security Regulations.    *Young v.
Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).    Nor may it
"displace the ALJ's judgment by reconsidering facts or evidence or making
credibility determinations."    *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)
(quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).    The court's task
is to determine whether the ALJ's decision is supported by substantial evidence,
which is "'such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'"    *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th
Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built
an 'accurate and logical bridge' from the evidence to [his] conclusion that the
claimant is not disabled."    *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)
(quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).    Where the
Commissioner's decision "'lacks evidentiary support or is so poorly articulated as
to prevent meaningful review,' a remand is required."    *Hopgood ex rel. L.G. v.
Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d
936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Crawford*, 633 F. Supp. 2d at 630; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. § 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.    Analysis**

Plaintiff claims that the ALJ's decision must be reversed because she (1) failed to properly consider the combined effects of Plaintiff's obesity together with her other impairments; (2) erred in weighing the physician opinion evidence; (3) made a flawed RFC determination; and (4) erred in assessing Plaintiff's credibility.

### 1.    Obesity

Plaintiff first argues that the ALJ failed to properly analyze how her obesity impacts her ability to work.  The Seventh Circuit has made it clear that "[a]n ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments."  *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012).  As SSR 02-1p explains, "the combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  SSR 02-1p, 2000 WL 628049, at *6.  *See also Tolbert v. Astrue*, No. 10 C 7940, 2012 WL 1245611, at *10 (N.D. Ill. Apr. 13, 2012).

Here, the ALJ found Plaintiff's obesity to be a severe impairment at step two of the analysis, (R. 42), and noted that Dr. Zachariah diagnosed her with "obesity (238 pounds)" in October 2009.  (R. 43).  She also discussed Dr. Altamimi's finding that Plaintiff had gained 80 pounds after becoming sober.  (R. 45).  At step four of the analysis, the ALJ cited Plaintiff's testimony that she weighed 260 pounds, (R. 47), but then made no further mention of her obesity. Plaintiff says this constitutes reversible error because an ALJ must affirmatively explain why obesity either does or does not cause functional limitations.  (Doc. 18, at 7) (citing SSR 02-1p, 2000 WL 628049, at *7).

The Court agrees that on the facts of this case, the ALJ erred in failing to explicitly consider the combined effects of Plaintiff's obesity along with her back, hip, knee and foot pain.  Though the ALJ referenced Plaintiff's weight and obesity

on several occasions throughout the decision, "she never explained how the obesity affected or did not affect [Plaintiff's] other conditions," all of which may be exacerbated by excessive weight. *Ulloa v. Barnhart*, No. 01 C 9229, 2003 WL 22388992, at *12 (N.D. Ill. Oct. 20, 2003). As the *Arnett* court has explained, "[i]f the ALJ thought that [Plaintiff's] obesity has not resulted in limitations on her ability to work, [s]he should have explained how [s]he reached that conclusion." 676 F.3d at 593.

Defendant argues that the ALJ's error was harmless because she considered Plaintiff's obesity indirectly by adopting limitations suggested by doctors who were aware of that condition. (Doc. 23, at 14). *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *Zenka v. Astrue*, 904 F. Supp. 2d 884, 899 (N.D. Ill. 2012). To be sure, Plaintiff's obesity has been well-documented by all of her treating and reviewing physicians. Dr. Zachariah and Dr. Cosgrove routinely noted her high BMI, and Dr. Zachariah started including obesity as an official diagnosis in October 2009. (R. 839, 974, 979). Dr. Wabner similarly cited to Plaintiff's BMI in making his December 2009 RFC assessment, which Dr. Madala affirmed in April 2010. In June 2010, Dr. Gupta recorded Plaintiff's weight as 248 pounds, (R. 1161), and in October 2010 and January 2011, Dr. Altamimi noted that her BMI was 39.38 and described her as obese. (R. 1002, 1187-88). The ALJ fully discussed these opinions throughout her decision. (R. 43-45, 49).

Plaintiff notes that only two of these physicians provided evidence as to her functional ability: Dr. Wabner and Dr. Altamimi. (Doc. 24, at 3). The Court

24

agrees that since the ALJ gave very little weight to Dr. Altamimi's opinion, it cannot support Defendant's harmless error argument. *See Arnett*, 676 F.3d at 593 (declining to find harmless error based on opinions that the ALJ either discounted or ignored). The ALJ afforded significant weight to Dr. Wabner's opinion, but Plaintiff says this is irrelevant because "significant evidence came into the record after [his] review . . . including: magnetic imaging showing additional spinal degeneration; positive straight leg raising, abnormal reflex, abnormal sensory, and abnormal gait and station clinical findings; and electromyogram results showing upper extremity and lower right extremity polyneuropathy." (Doc. 24, at 3-4) (citing R. 941, 1003, 1183, 1188).

Plaintiff does not explain why these tests negate the fact that Dr. Wabner considered her obesity in assessing her RFC. The only case Plaintiff cites for this proposition, *Arnett v. Astrue*, involved a situation where the ALJ credited an opinion from a physician who knew about the plaintiff's obesity, but who assigned work limitations based solely on her chronic obstructive pulmonary disease without mentioning another key impairment, osteoarthritis. 676 F.3d at 593. The court declined to find harmless error under such circumstances. *Id.* Here, there is no dispute that at the time Dr. Wabner completed his December 2009 RFC assessment, he had access to medical records addressing Plaintiff's OA of the knees and neck, hip bursitis, shoulder bursitis, low back pain, obesity diagnosis, fibromyalgia, and pain in the hands and wrists. The only new impairment that emerged after that date was foot pain and numbness dating to January 2010,

and Dr. Madala had access to that information when he affirmed Dr. Wabner's opinion in April 2010.

Plaintiff may believe that she has greater functional limitations than those set forth by Dr. Wabner, but that has no bearing on whether the ALJ indirectly considered her obesity by adopting Dr. Wabner's opinion. *See Kittelson v. Astrue*, 362 Fed. Appx. 553, 559 (7th Cir. 2010) (finding harmless error where the ALJ "based his RFC on the limitations identified by doctors . . . who specifically noted [the plaintiff's] obesity, so it was 'factored indirectly' into his analysis."). For similar reasons, the mere fact that Plaintiff told her physical therapist in August 2010 that she "feels" her weight "contributes to the pain" is irrelevant to the harmless error analysis. (R. 1170).

On the record presented, Plaintiff's request that the case be reversed or remanded because the ALJ failed to consider the combined effects of her obesity and other impairments is denied.

## 2.    Physician Opinion Evidence

Plaintiff next argues that the ALJ erred in rejecting Dr. Altamimi's opinion and granting controlling weight to the opinions of Dr. Cosgrove and Dr. Zachariah. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astru*e, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astru*e, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739,

26

and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5) whether the opinion was from a specialist. 20 C.F.R. § 404.1527(c)(2)-(5). *See, e.g.*, *Simila*, 573 F.3d at 515.

### a. Dr. Altamimi

Plaintiff first objects that the ALJ committed reversible error when she stated that "the record does not contain any opinions from treating or examining physicians indicating the claimant is disabled or even has limitations greater than those determined in this decision." (R. 49). As Plaintiff notes, Dr. Altamimi opined that she in fact has several additional limitations that would preclude competitive work, including a need to take unscheduled breaks every hour and to elevate her legs for 60% of the workday. (R. 1191-92). Regardless, the Court agrees with Defendant that this misstatement is harmless in light of the ALJ's very next sentence confirming that she "is well aware of Dr. Altamimi's assessment of February 3, 2011." (R. 49). The ALJ discussed that opinion in detail earlier in the decision, (R. 45), and explained here why she did not give it much weight. (R. 49). In the Court's view, this is not the type of "inconsistent statement" that warrants remand. *Compare Parker v. Astrue*, 597 F.3d 920, 924-25 (7th Cir. 2010) (remanding case where the ALJ first stated that the plaintiff suffered from depression and PTSD as of her date last insured, but then

concluded that all of her psychiatric impairments had surfaced after the date last insured).

Plaintiff next argues that the ALJ should have given Dr. Altamimi's opinion more weight. Dr. Altamimi's February 3, 2011 RFC assessment indicates that Plaintiff is incapable of working because she: must be able to take unscheduled breaks every hour throughout the day; must elevate her legs 12 inches for 60% of the workday; can sit for less than 2 hours in an 8-hour workday; can only walk one block before needing to rest; can only stand for 5 minutes at a time; can only grasp with her hands for 50% of the workday; and would be absent from work more than 4 days per month. (R. 1191-93). The only "clinical findings and objective signs" Dr. Altamimi cited in support of this assessment were a positive straight leg raise test at 45 degrees on the right, and decreased vibration in Plaintiff's feet, more pronounced on the right. (R. 1190). As the ALJ noted, Dr. Altamimi provided no explanation as to how these two relatively minimal findings translate into such severe functional limitations. (R. 49).

The same can be said of the other diagnostic evidence of record, which similarly reflects essentially mild abnormalities of the neck, hands, knees and back. For example, an X-ray of Plaintiff's cervical spine in March 2008 showed intervertebral disc space narrowing at C2-C3, C4-C5 and C5-C6, as well as stenosis at C2-C3. (R. 43, 343). Dr. Zachariah gave Plaintiff cortisone injections in her shoulders in April 2008 to address what she described as significant OA of the neck, but never repeated that procedure. (R. 362). Plaintiff did not complain of neck pain again until February 2010, when she experienced a "muscle spasm"

after shoveling snow. She exhibited normal range of motion in her spine at that time, and by March 2010 the pain had improved with medication. (R. 44, 912, 915). An MRI of Plaintiff's cervical spine taken nearly a year later on January 19, 2011, moreover, showed no central spinal or foraminal stenosis and only a small right paracentral disc protrusion, along with degenerative changes at C5-8. (R. 45, 1183).

Dr. Zachariah diagnosed Plaintiff with OA of the knees and hip bursitis in March 2008. Knee X-rays taken in May 2008 revealed only mild bilateral narrowing in the medial joint compartments, greater on the right. (R. 340-41). Dr. Zachariah treated Plaintiff with injections and medication through March 16, 2010, at which time Plaintiff's knees and hip were both "better" and she had no joint pain, stiffness or swelling. (R. 44, 912, 915). She also exhibited a normal gait in October and November 2009, and in January and February 2010. (43, 837, 840, 920, 925). Plaintiff complained of foot pain stemming from an old, untreated injury in early 2010, but X-rays showed only mild degenerative changes and spurring consistent with old trauma. (R. 43-44, 922).

The findings from an April 2010 nerve conduction EMG study of Plaintiff's legs were "most consistent with mild right chronic L5-S1 radiculopathy," and an MRI of the lumbar spine showed: persistent central disc herniation at T11-12 resulting in "moderate compression of the ventral thecal sac with mild central canal stenosis suspected"; diffuse disc bulging at L3-4 with degenerative facet change resulting in mild central spinal canal narrowing; postoperative changes at L4-5 and L5-S1 with disc bulging and degenerative facet changes; and "[r]esidual

29

narrowing of the inferior proximal right neural foramen at L5-S1." (R. 44, 941). To address Plaintiff's back pain that radiated to the right leg, Dr. Gupta gave her epidural steroid injections in July and September 2010, which "helped her enormously." At the September appointment, straight leg raise tests and Patrick's signs were all negative. (R. 44, 1149, 1151, 1156-57).

The following month, on October 18, 2010, Plaintiff's physical therapist stated that she failed two of six PT goals relating to standing and walking, but an exercise referral precluded only jogging, stair climbing, cross country skiing, high impact dance exercise classes, and bending too much. (R. 44, 1176). Allowed activities included walking, rowing, stationary biking, recumbent biking, aqua aerobic classes, and low impact dance exercise classes. (R. 1176). Ten days later, on October 28, 2010, Dr. Altamimi concluded that Plaintiff's gait, stability, reflexes and sensation were all abnormal, and he added Lidoderm patches to her medication regimen. (R. 45, 1003). When Dr. Altamimi saw Plaintiff again in January 2011, she had a positive straight leg raise test on the right and abnormal reflexes, but her stability and muscle strength were normal. Dr. Altamimi instructed Plaintiff to continue her current medications but decrease her dosage of Lyrica. (R. 1188). Finally, an EMG from January 2011 showed mild sensorimotor polyneuropathy involving both arms and the right leg, but there was no evidence of radiculopathy. (R. 45, 1196).

Plaintiff does not address most of the above-cited tests and treatment notes, much less explain how they support Dr. Altamimi's assessment. Instead, she argues that the ALJ committed reversible error by failing to acknowledge that

Case: 1:12-cv-05271 Document #: 28 Filed: 12/13/13 Page 31 of 46 PageID #:1372

Dr. Altamimi observed "abnormal gait and station, with abnormal stability and an inability to tandem walk; positive straight leg raising at forty-five degrees; abnormal reflexes; and abnormal sensation." (Doc. 18, at 14; Doc. 24, at 11). In Plaintiff's view, this evidence refutes the ALJ's determination that Dr. Altamimi's opinion lacks medical substantiation. (*Id*.). The Court disagrees. An ALJ "need not discuss every piece of evidence in the record" as long as she builds "an accurate and logical bridge from the evidence to [her] conclusion." *Murphy v. Barnhart*, 417 F. Supp. 2d 965, 970 (N.D. Ill. 2006). Dr. Altamimi is the only physician who ever found a positive straight leg raise test, and that occurred in January 2011, some two years after Plaintiff's alleged disability onset date. Dr. Altamimi provided no explanation as to why this finding translates into the significant functional restrictions set forth in his RFC assessment. This is particularly troubling since Dr. Gupta reported negative straight leg raise test results just three months earlier on September 7, 2010, and Dr. Altamimi himself reported normal range of motion on October 28, 2010. (R. 1003, 1152).

Dr. Altamimi is also the only physician who ever reported abnormal gait, sensation and reflexes, again with no explanation as to why these symptoms require Plaintiff to, among other things, take unscheduled breaks every hour, raise her legs for 60% of the workday, walk no more than one block, sit for less than 2 hours, and miss work more than 4 days per month. Notably, Plaintiff ignores the fact that Dr. Altamimi himself said that her stability and strength had returned to normal in January 2011. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) ("[t]he patient's regular physician may want to do a favor for a

friend and client, and so the treating physician may too quickly find disability.")
(internal quotations omitted).[4]  Viewing the record as a whole, the ALJ built a
logical bridge between the medical evidence and her conclusion that Dr.
Altamimi's assessment is not supported by objective testing or his own treatment
notes.

As required by the Social Security regulations, the ALJ went beyond the
objective tests and provided additional reasons for discounting Dr. Altamimi's
opinion.  She first noted that Dr. Altamimi had treated Plaintiff only four times in
four months so his records did "not show [her] longitudinal condition."  (R. 49).
Plaintiff claims that this was improper because the ALJ simultaneously gave
significant weight to "the state agency physician who never examined" her at all.
(Doc. 18, at 14).  Plaintiff cites no authority for this proposition, likely because it is
well-established that "it is up to the ALJ to decide which doctor to believe – the
treating physician who has experience and knowledge of the case, but may be
biased, or that of the consulting physician, who may bring expertise and
knowledge of similar cases – subject only to the requirement that the ALJ's
decision be supported by substantial evidence."  *Micus v. Bowen*, 979 F.2d 602,
608 (7th Cir. 1992).  *See also Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir.
2004) ("The ALJ may properly rely upon the opinion of [state agency] medical
experts."); *Mont v. Chater*, 114 F.3d 1191, at *7 (7th Cir. 1997) ("[T]he law does

---

[4]     It is worth noting that Dr. Altamimi also limited Plaintiff to "low stress jobs" even
though she does not claim to have any mental impairments.  In the space provided for
an explanation of this finding, Dr. Altamimi left the form blank.  (R. 1191).

not require an ALJ to accord a treating source's opinion more weight than a consulting physician's opinion.").

The ALJ fairly observed that Dr. Altamimi's treatment history with Plaintiff was quite limited, as the record contains only two treatment notes from him. By comparison, Dr. Cosgrove and Dr. Zachariah both had a "lengthy treatment relationship with [Plaintiff]" extending over the course of two years or more. (R. 49). Plaintiff argues that the only "opinions" provided by Dr. Cosgrove and Dr. Zachariah are the email messages declining to support her application for disability benefits. She describes those responses as "perfunctory and vague statements" that are no less "conclusory" than any opinion offered by Dr. Altamimi. (Doc. 18, at 13-14; Doc. 24, at 10). This argument ignores the fact that the ALJ discussed all of the treatment notes from Dr. Cosgrove and Dr. Zachariah in great detail, (R. 43-44), found them to be consistent with "objective medical evidence and the overall record," and concluded that they did not evidence greater restrictions than those set forth by Dr. Wabner. (R. 45, 49).

Dr. Altamimi's RFC largely contradicts these medical findings but, as noted, there is no explanation for why the positive straight leg raise test, decreased foot vibration, or any other objective test results require Plaintiff to take unscheduled breaks every hour, raise her legs for 60% of the workday, walk no more than one block, sit for less than 2 hours, and miss work more than 4 days per month. Notably, Plaintiff does not identify any treatment records from Dr. Cosgrove or Dr. Zachariah that confirm the necessity of such limitations. The Court is satisfied that the ALJ did not err in considering Dr. Altamimi's short

33

treatment history with Plaintiff, as well as the conclusory nature of his RFC assessment as factors in discounting his opinion. *See Ridinger v. Astrue*, 589 F. Supp. 2d 995, 1005-06 (N.D. Ill. 2008) (if treating physician opinion is not given controlling weight, ALJ must consider what weight to give it in light of several factors, including "length of treatment relationship, frequency of treatment, [and] nature and extent of treatment relationship."); *Gildon v. Astrue*, 260 Fed. Appx. 927, 929 (7th Cir. 2008) ("An ALJ is not required to accept a doctor's opinion if it is brief, conclusory, and inadequately supported by clinical findings.") (internal quotations omitted).

The ALJ also gave little weight to Dr. Altamimi's opinion because "the course of treatment [he] pursued . . . has not been consistent with what one would expect if [Plaintiff] were truly disabled." (R. 49). The ALJ posited that if Plaintiff really had the severe limitations identified by Dr. Altamimi, "further treatment and testing would have been expected." (*Id.*). Citing *Myles v. Astrue*, 582 F.3d 672 (7th Cir. 2009), Plaintiff first objects that the ALJ "does not set forth a supported rationale of what she deems appropriate treatment." (Doc. 18, at 14; Doc. 24, at 11). The ALJ in *Myles* improperly "played doctor" by concluding that the plaintiff's diabetes was not a significant problem because his treating physicians did not prescribe insulin. *Id.* at 677. The Seventh Circuit explained that since "no doctor gave any reason why insulin was not prescribed," the ALJ's inference that it signified a small problem was "wholly unsupported by the record." *Id.* at 677-78.

In this case, the ALJ did not speculate about why Plaintiff either did or did not receive certain treatments. The record reflects that Plaintiff's medication and treatment regimen remained essentially constant while she was seeing Dr. Zachariah and Dr. Cosgrove, neither of whom would support her application for disability benefits. Though Dr. Altamimi's restrictive RFC assessment suggested that Plaintiff's condition had significantly worsened, this was not reflected in the objective medical tests, or in the fact that he barely changed her medication regimen at all aside from adding Lidoderm patches and decreasing her dosage of Lyrica. Plaintiff claims that the ALJ should have considered the possibility that Dr. Altamimi declined to alter her medication due to her history of addiction and stomach ulcers that limit her ability to take NSAIDs. (Doc. 18, at 14; Doc. 24, at 11). Of course, this is mere speculation on Plaintiff's part as Dr. Altamimi in no way indicated that he wanted to prescribe more medication but was unable to do so. As for the ALJ's statement about further testing, the Court agrees that it is neither instructive nor appropriate in this context. Nevertheless, since the ALJ expressly considered the MRI and EMG ordered by Dr. Altamimi in January 2011 along with all of the other evidence of record, this is not sufficient to render the ALJ's decision so unsupported as to require reversal or remand. (R. 45).

Plaintiff's final argument that the ALJ should have recontacted Dr. Altamimi rather than simply rejecting his opinion requires little attention. (Doc. 18, at 15). "An ALJ need recontact medical sources only when the evidence is inadequate to determine whether the claimant is disabled." *Skarbek*, 390 F.3d at 504. The ALJ in this case "viewed the record as unconvincing rather than

inadequate," making it unnecessary for her to recontact Dr. Altamimi. *Moore v. Astrue*, No. 08 C 5180, 2010 WL 2166629, at *8 n.1 (N.D. Ill. May 27, 2010).

In sum, the ALJ's decision to afford little weight to the opinion of Dr. Altamimi is supported by substantial evidence.

### b. Dr. Cosgrove and Dr. Zachariah

Turning to Dr. Cosgrove and Dr. Zachariah, Plaintiff argues that the ALJ erred in giving both of their opinions controlling weight. As noted, the ALJ discussed the physicians' extensive treatment notes in detail, (R. 43-44), and then "emphasized that [they] refused to support [Plaintiff's] allegations that she was completely and totally disabled." (R. 49). Specifically, on May 19, 2010, Plaintiff called Dr. Cosgrove and Dr. Zachariah because her lawyers told her that she "needs to make sure her physicians will support her" claim for disability benefits. Plaintiff explained that she was seeking these benefits "with diagnosis of fibromyalgia and history of back surgery in 2005," and noted that she was a waitress and could "no longer lift, or even do yard work on her knees anymore." (R. 976). The treatment note reflects that Dr. Zachariah responded by email stating that she "can't support this as a reason for disability." Dr. Cosgrove also responded with an email stating that "I would say she could still work, maybe not her current job, or with restrictions. I would say she is not completely disabled." (*Id.*).

Plaintiff insists that neither email message undermines her claim of disability. She first notes that Dr. Zachariah was not treating her for fibromyalgia or back pain, the only conditions cited in the May 19, 2010 message, and that the

doctor "did not say that she could not support other reasons for disability," such as hip, knee and "leg difficulties." (Doc. 18, at 12; Doc. 24, at 8). Of course, the inverse is also true – Dr. Zachariah in no way indicated that Plaintiff actually has any other disabling conditions. This is significant because Dr. Zachariah had been treating Plaintiff for more than two years at the time, and though Plaintiff clearly wanted the doctor to say that she is unable to work, Dr. Zachariah declined the opportunity to do so. *See, e.g., Scott v. Sullivan*, 898 F.2d 519, 523 (7th Cir. 1990) (ALJ properly relied on certain "negative inferences" in the record indicating that the plaintiff did not meet a Listing, including the fact that his doctor "declined to give his opinion" on that issue). Moreover, Plaintiff concedes that Dr. Cosgrove, who has been treating her since at least 2006, likewise refused to support her application for disability benefits based on his belief that she remains capable of working. (R. 976).

Plaintiff argues that the ALJ still had no basis for giving controlling weight to these opinions because neither Dr. Zachariah nor Dr. Cosgrove identified her specific functional abilities, much less stated that she is capable of performing light work consisting of standing and walking for 6 hours in an 8-hour workday. (Doc. 18, at 12-13; Doc. 24, at 9). Regardless, Dr. Wabner found that Plaintiff can engage in light work, and she points to nothing in the treatment notes from Dr. Zachariah or Dr. Cosgrove that contradicts this assessment. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("[E]ven if reasonable minds could differ concerning whether [the plaintiff] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported.")

37

(internal quotations omitted). Plaintiff's mere speculation that the doctors may believe she is capable of only sedentary work appears nowhere in the record and cannot support a remand in this case. (Doc. 24, at 9).

Citing SSR 96-5p, Plaintiff finally objects that statements from a treating physician that a person is or is not disabled can never receive "controlling weight" as a matter of law. (Doc. 18, at 13; Doc. 24, at 9-10). To be sure, the Commissioner bears the final responsibility for determining whether a person is "disabled" under the Act, and a treating physician's blanket assertion in that regard is not dispositive. SSR 96-5p, 1996 WL 374183, at *2. As noted, however, a treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *1. Here, the ALJ explained that Dr. Zachariah and Dr. Cosgrove had a "lengthy treatment relationship with [Plaintiff]," and that their opinions, found not only in the email messages but also in their extensive treatment notes, are supported by "objective medical evidence and the overall record." (R. 49). On this record, the ALJ did not err in giving controlling weight to the opinions of Dr. Zachariah and Dr. Cosgrove.

### 3.    RFC Determination

Plaintiff next seeks reversal or remand based on the ALJ's allegedly flawed RFC determination. A claimant's RFC is the maximum work that she can perform despite any limitations, and is a legal decision rather than a medical one.

20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(1); SSR 96-8p. "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'" *Craft*, 539 F.3d at 676.

Plaintiff claims that "Seventh Circuit decisions . . . do not support that [she] retained the ability to perform light work . . . given her many musculoskeletal problems combined with her obesity." (Doc. 18, at 8). She first directs the Court to *Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005), where the plaintiff suffered from "disk disease, which causes her pain in sitting, standing, etc." *Id.* at 868. The Seventh Circuit held that the ALJ erred in finding the plaintiff capable of light work without also considering the fact that she was obese. As the court explained, "[t]he effect of the disk disease . . . is likely to be different [for an obese and non-obese person] by virtue of the difference in weight." *Id.* Plaintiff says she "arguably presents an even more compelling case for inability to perform light work because in addition to her severe back impairment interacting with obesity, her musculoskeletal impairments also include severe impairments of the knee, hip, and ankle." (Doc. 18, at 8).

The problem for Plaintiff is that unlike in *Gentle*, the ALJ's RFC determination is based directly on findings from Dr. Wabner, affirmed by Dr. Madala, that despite Plaintiff's obesity and other impairments she remains capable of standing and walking for 6 hours in an 8-hour workday. *Compare Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (where no physician stated that the plaintiff, who was grossly obese with arthritic knees, could stand for two hours at a time, the ALJ's determination in that regard "borders on the

39

fantastic."). Plaintiff disagrees with this assessment and believes she should be restricted to sedentary work, which would make her disabled under the Medical-Vocational Guidelines given her age (over 50), high school education and lack of transferrable skills. (Doc. 18, at 9-10; Doc. 24, at 5-6) (citing 20 C.F.R. § 404, Subpt. P, App. 2, Rule 201.14). Of course, no physician actually limited Plaintiff to sedentary work. Dr. Altamimi found her capable of less than sedentary work, but as explained earlier, the ALJ reasonably discounted this assessment, leaving uncontroverted the RFC for light work from Dr. Wabner.

Plaintiff finds it significant that despite achieving four out of six physical therapy goals, she failed her goals relating to standing for 10-15 minutes without increased complaints of pain, and walking short distances for exercise. (R. 1171). In Plaintiff's view, these failures are not "essentially consistent" with the stated RFC, as suggested by the ALJ, and she questions "the basis for [this] finding." (R. 49; Doc. 18, at 16; Doc. 24, at 12). On the issue of standing, Plaintiff's argument is unavailing because at the September 9, 2010 therapy session, she herself reported that she could stand in one place for 10 minutes. (R. 1168). She ultimately did not achieve her goal of standing in one place for longer than 10 minutes, but the RFC does not require her to do so. (*See* Doc. 24, at 12) (arguing that Plaintiff's "therapist found that [she] could stand for *no more than* ten minutes at a time.") (emphasis added).

Plaintiff's next claim, that even Dr. Wabner limited her standing to 5 minutes at a time, reflects a misreading of his report. (Doc. 18, at 16). Dr. Wabner stated that Plaintiff can stand for 6 hours in an 8-hour workday without

further limitation. (R. 904). The citation to standing for 5 minutes was drawn from Plaintiff's own Activities of Daily Living Questionnaire, and used as evidence of her partial credibility. (R. 908). As for Dr. Altamimi's opinion that Plaintiff can only stand for 5 minutes, the ALJ reasonably rejected this position for the reasons explained earlier. Given that the ALJ found Plaintiff more limited in her ability to stand than Dr. Wabner, the Court cannot say that she made an improper independent medical assessment. *Compare Suide v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010) (RFC improper where no physician indicated that the plaintiff was capable of standing and walking for 6 hours in an 8-hour workday). It is less clear that the PT notes support Plaintiff's ability to walk for 6 hours in an 8-hour workday, but any misstatement in that regard is harmless given that the ALJ adopted this limitation directly from Dr. Wabner's RFC, which she found consistent with treatment notes from Dr. Cosgrove and Dr. Zachariah. *Compare Scott*, 647 F.3d at 740 (ALJ erred in finding the plaintiff capable of standing for 6 hours where no physician supported this view).

On the record presented, the ALJ adequately explained how she arrived at her RFC determination and Plaintiff's motion for summary judgment on this basis is denied.

### 4. Credibility Determination

Plaintiff finally argues that the ALJ's credibility determination is flawed. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ

to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder*, 529 F.3d at 413-14.

The ALJ first observed that "the objective medical evidence does not document the existence of impairments of sufficient severity to be totally work-preclusive." (R. 48). The Court need not reiterate these extensive findings, as the only error Plaintiff identifies in this regard is the ALJ's assertion that she "reported numbness in her wrists, which is not supported by objective findings." (R. 48). Plaintiff insists that this is inaccurate because "upper extremity electromyogram findings were abnormal." (Doc. 18, at 17). The ALJ acknowledged the January 2011 EMG results, but prior to that time, Plaintiff had not complained to any physician about hand or wrist numbness since July 2008, at which time the pain was better and she had no joint swelling or stiffness. (R. 756). Moreover, the ALJ observed that Plaintiff "has reported she enjoyed scrapbooking and gardening, without kneeling[,] and these activities involved frequent use of her hands and wrists." (R. 48). Plaintiff does not dispute this

characterization of her hobbies, and the ALJ was not patently wrong in discounting Plaintiff's claims of disabling wrist and hand pain.

The ALJ went on to consider other factors that affect credibility as required by 20 C.F.R. § 404.1529. She stated, for example, that while Plaintiff's use of appropriate medications and injections weighs in her favor, those treatments have "been relatively effective in controlling [her] symptoms."[5] (R. 48). Plaintiff concedes that "some treatment modalities provided temporary relief," but says that the pain was nonetheless "recurring and persistent." (Doc. 18, at 20). In fact, the record supports the ALJ's finding that the treatments were generally quite helpful. Dr. Zachariah gave Plaintiff cortisone injections in her hip and knee in September 2008, (R. 750), and when Plaintiff saw Dr. Cosgrove nearly a year later in August 2009, she was "[f]eeling great." (R. 727). Plaintiff received further injections in October and November 2009, by which time she reported "[s]tarting to exercise again." (R. 831, 837).

At a February 2010 appointment with Dr. Zachariah, Plaintiff's hip and knee pain were both "better," and in March 2010, her snow shoveling-induced neck and cervical pain had improved with Limbrel and Flexeril. (R. 912, 915). The epidural steroid injections Plaintiff received from Dr. Gupta in July and

---

[5] Given the ALJ's extensive discussion of the nature and effectiveness of what she described as Plaintiff's "appropriate" treatment history, including surgeries, PT, injections, epidurals and pain medications, (R. 43-45, 47-49), her credibility finding is not patently wrong merely because she stated in passing that Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 48). *Compare Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) (ALJs concern about "lack of aggressive treatment" identified as but one of many problems with the credibility finding).

September 2010 for back pain also "helped her enormously."[6] (R. 1149, 1151, 1156-57). *See Molnar v. Astrue*, 395 Fed. Appx. 282, 288 (7th Cir. 2010) ("[T]he ALJ was permitted to consider the effectiveness of treatment, including surgery and epidural injections, in making her credibility determination."); *Skinner*, 478 F.3d at 845 (affirming ALJ's credibility finding where "the record medical evidence established that [the plaintiff's] symptoms are largely controlled with proper medication and treatment.").

Looking next to Plaintiff's daily activities, the ALJ determined that they "are not the activities and abilities of an individual who is completely unable to engage in any substantial gainful activity." (R. 48). In that regard, the ALJ noted that Plaintiff can care for her own personal needs and those of her two dogs; prepare simple meals; do light housekeeping chores, including laundry, light housecleaning and light yard work; drive; shop; visit her grandmother; attend daily AA meetings, chair two of them and host a home group; watch television; play computer games; and read. (*Id.*). Plaintiff faults the ALJ for failing to consider the fact that she "performed these tasks in small increments and with assistance." (Doc. 18, at 19). Specifically, Plaintiff testified that her husband buys the heavy groceries (R. 77); her son puts the soil into flower pots for her (R. 78); she only does one scrapbooking page at a time because she cannot look down for very long (R. 79); and she does not lift heavy loads of laundry and has to lean while folding the clothes. (R. 85, 87).

_____

[6]    Plaintiff does not dispute that "she had no side effects from her prescribed medications." (R. 48, 69).

The Seventh Circuit has "cautioned that a person's ability to perform daily activities, especially if th[ey] can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Here, the ALJ "did not overstate [Plaintiff's] ability to perform daily activities" or place undue weight on them. *Molnar*, 395 Fed. Appx. at 288. Rather, the ALJ clearly noted that Plaintiff could only do "light" chores and prepare "simple" meals, and cited this as but one of the factors undermining Plaintiff's credibility. *Roddy*, 705 F.3d at 639 ("[I]t is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96-7p, at *3," as long as it is "done with care."). For this reason, the ALJ's statement that Plaintiff's activities "clearly reflect the ability to perform her past relevant light work," (R. 48), is not sufficient to justify a reversal or remand. Viewing the decision as a whole, the Court is satisfied that notwithstanding this remark, the ALJ considered appropriate evidence in discounting Plaintiff's testimony and did not simply equate her daily activities with an ability to work.

In sum, the ALJ's credibility determination is not patently wrong, and Plaintiff's motion for summary judgment on this basis is denied. *Elder*, 529 F.3d at 413-14; *Simila*, 573 F.3d at 517 (an ALJ's credibility determination is entitled to "deference, for an ALJ, not a reviewing court, is in the best position to evaluate credibility.").

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment (Doc. 22) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: December 13, 2013

SHEILA FINNEGAN
United States Magistrate Judge